Filed 12/19/24  P. v. Villegas CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO SARRAZA VILLEGAS,<br><br>        Defendant and Appellant. | A165626<br><br>(Napa County Super. Ct. No. 19CR001441) |

Defendant appeals following his convictions for sexual offenses committed against three child victims and the imposition of an aggregate prison term of 128 years to life for these crimes. He contends that his conviction on count 1, for lewd and lascivious acts against Jane Doe 1 (Doe 1), must be reversed due to the trial court's exclusion of impeachment evidence regarding Doe 1's parents' applications for U visas.[1]  He also challenges his

---

[1] A U visa can provide legal status for noncitizens who are the victims of certain crimes who assist in the investigation and prosecution of those crimes.  (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1267 (*Castaneda-Prado*); 8 U.S.C. § 1101(a)(3) & (15)(U)(i)–(iii).)  After U visa status is approved by

sentences on three convictions under Penal Code[2] section 667.61 (the "One Strike" law) on due process grounds. We reverse defendant's conviction on count 1 and order that the One Strike sentences for his convictions on counts 3, 5, and 6 be reduced to 15 years to life. We otherwise affirm the judgment.

## BACKGROUND

### I. Procedural Background

An amended information charged defendant with committing a lewd and lascivious act on Doe 1, a child under the age of 14 (§ 288, subd. (a), count 1); committing a lewd and lascivious act on Jane Doe 2 (Doe 2), a child under the age of 14 (§ 288, subd. (a), count 2); sexually penetrating Doe 2, a minor over the age of 14, with a foreign object (§ 289, subd. (a)(1)(C), count 3); committing a lewd and lascivious act on Doe 2, a child either 14 or 15 (§ 288, subd. (c)(1), count 4); sexually penetrating Jane Doe 3 (Doe 3), a minor over the age of 14 (§ 289, subd. (a)(1)(C), count 5); and forcibly orally copulating Doe 3, a minor over the age of 14 (former § 288a, subd. (c)(2)(C), count 6). The information contained multiple victim allegations under various subdivisions of section 667.61 as to counts 1 through 6. A jury convicted defendant on all counts and found all allegations true.

---

the United States Citizenship and Immigration Services, that status is valid for four years (8 C.F.R. § 214.14(g)), and, after maintaining U visa status for three years, the holder may apply for lawful permanent resident status. (8 U.S.C. § 1255(m).)

[2] All further statutory references are to the Penal Code unless otherwise stated.

2

The court sentenced defendant to five consecutive terms of 25 years to life in prison on counts 1, 2, 3, 5, and 6, plus the upper term of three years on count 4, and imposed fines, fees, and restitution.

## II. The Evidence Presented At Trial[3]

### A. The Prosecution's Case

In 2019, Doe 1 lived with her younger sister, her mother (Mother) and her father (Father). Doe 1 was enrolled in an individualized educational study program and received speech therapy at school. The family's residence was a converted garage attached to a main house where Doe 1's godmother and Lucio Villegas (Lucio V.) lived with their two daughters, Does 2 and 3. Lucio V.'s brother, defendant, lived in the main house as well.

On May 21, 2019, Mother sat Doe 1 and her sister down to talk because she noticed that Doe 1 had been "very sad." She asked Doe 1 if defendant and Lucio V. had touched her, and Doe 1 said, "Yes." Father joined the conversation, and Doe 1 told her parents that defendant had touched her over her clothing. Doe 1 cried, and Mother comforted her. Mother had not seen defendant touch Doe 1 in May 2019, but she did notice that Doe 1 seemed

---

[3] We set forth the evidence regarding defendant's 2019 crime against Doe 1 in detail. Defendant's crimes against Does 2 and 3 (counts 2 through 6) occurred between 2010 and 2016. We omit a detailed discussion of the evidence underlying counts 2 through 6 because defendant does not challenge those convictions and neither party argues that this evidence plays a dispositive role in this appeal.

more clingy than usual.[4]  At some point, Mother had witnessed defendant smack Doe 1's buttocks with an open palm, but it had not concerned her.

On May 22, 2019, Doe 1 and her parents reported the abuse to a school official who assisted the family in filing a report with the police.  Mother testified that she thought that the school would help her and call the police for her.  Mother spoke to the police and took Doe 1 to speak to the police that day.

On cross-examination, Mother confirmed that it was uncomfortable living in the converted garage because her family had to share one room and Lucio V. would threaten to kick them out.  She testified that someone in the main house warned her about defendant, although she conceded that she did not have such a conversation with Doe 2 or 3, and counsel attempted to impeach her with testimony from Lucio V.'s trial regarding whether anyone had warned her about defendant.  Mother testified that she had applied for low-income housing in 2018, and she confirmed that she was worried because it was difficult to get low-income housing and she was desperate for such housing.  As of May 2019, Mother had attended two low-income housing appointments, and she confirmed that she had a third appointment in the afternoon on the day she reported Doe 1's

---

[4] Mother testified that she saw Lucio V. touch Doe 1 on her chest and vagina in 2018.  Lucio V. was tried separately for his sexual offenses against Doe 1, Doe 1's sister, and his daughter, Doe 3.  Another Division of this court affirmed Lucio V.'s convictions.  (*People v. Villegas* (2023) 97 Cal.App.5th 253, 258–261 (*Villegas*).)

4

abuse. Additionally, Mother testified that she remembered a call with the detective in this case wherein she asked for a copy of the police report. She confirmed that she believed that providing a copy of the police report would expedite her low-income housing application and someone went to get the report.

On redirect, Mother testified that she formed her belief that the police report could expedite her low-income housing application after Doe 1 disclosed the abuse to her and after filing the police report in this case. On re-cross, she testified that she learned about the potential benefit of the police report at her third low-income housing appointment, but she could not remember how the low-income housing staff found out that there was a police report.

Doe 1 testified at trial that, around May 1, 2019, when she was 11 or 12 years old, defendant touched her chest and vaginal area. Doe 1 testified that she was in the backyard playing with her sister when defendant came outside and touched her chest with his bare hand both over and under her clothing. He touched her under her shirt with a rubbing motion for a few seconds. She felt uncomfortable. At "a different time," defendant also touched her vaginal area with his bare hand both over and under her clothing for a few seconds. She did not say anything, but she did try to push his hands away. Eventually, he stopped touching her. Shortly after, Mother came outside, and defendant left the backyard and went inside the main house. Doe 1 did not initially tell her parents what defendant had done to her because she felt nervous.

Doe 1 confirmed on cross-examination that it was sometimes okay to lie if her mother told her to lie. She testified that her parents told her what to say to the detective when she first talked to police. She told the detective that she had been playing outside with her sister when defendant touched her chest over her clothing before also touching her sister's chest. Doe 1 agreed that she told police that defendant only touched her one time on top of her clothing, and she agreed that she was telling the truth at that time. She said that she told her parents that defendant had touched her inappropriately, although she did not specify when that conversation occurred. Doe 1 also testified that Mother had helped her remember some of the things she was supposed to say in court. On redirect, Doe 1 confirmed that she told the truth in her trial testimony. When the prosecutor asked her whether anyone told her to lie, she responded, "I don't know."

Father testified that, in May 2019, he made a report to Doe 1's school and spoke to police after Doe 1 told Mother and Father that defendant touched her once on her breasts. Father reported this to the school because he wanted to see if they would help, and he thought they would call the police. Father also testified about an incident that occurred two or three days before reporting Doe 1's abuse when he watched through a gap in a fence gate as defendant touched Doe 1's chest. He said he did not confront defendant because defendant had been drinking. Instead, Father warned Doe 1 not to allow anyone to touch her that way.

6

On cross-examination, Father confirmed that he had been trying to obtain low-income housing, he had a third appointment for low-income housing on the day they reported Doe 1's abuse, and that third appointment was very important to him. However, he did not get the low-income apartment. Father also confirmed that he told police when he first reported the abuse that he had found out about it the night before, and he only told them about seeing defendant touch Doe 1 at the end of the interview.

Sheriff Gregg Lee testified that he interviewed Mother and Father on May 22, 2019, with an interpreter. Mother told him that nothing in particular had caused her to sit her daughters down to ask about abuse. Towards the end of the interview, Father told Lee he saw defendant touch Doe 1 about a week earlier.

Detective Dustin Dodd interviewed Doe 1 and Father on May 22, 2019, and Detective Jason Barrera assisted as a translator for Father. Doe 1 reported that defendant had molested her by touching her over her clothing. Dodd testified that he observed that Doe 1 appeared to have some sort of developmental delay. According to Dodd, Father said that he did not see defendant sexually abuse Doe 1. However, according to Barrera, Father only said that he never saw Lucio V. touch Doe

7

1, but Barrera did not ask Father if he ever saw defendant touch her.[5]

### B. The Defense Case

Sergeant Salem testified that he assisted Sheriff Lee and translated Father's first interview at the school on May 22, 2019. In the last five to 10 minutes of the interview, Father said that he saw Doe 1 bend over to shake defendant's hand, and defendant touched her breast. Father said that he stayed quiet because he did not want to cause any issues with defendant, and he did not ask Doe 1 about it because he had seen what had happened.

Defendant testified that he was never alone with the victims, and he did not commit any of the acts alleged against him.

## DISCUSSION

## I. Exclusion of U visa Evidence

Defendant first challenges the trial court's exclusion of evidence regarding Doe 1's parents' U visa applications, arguing that the court violated his right under the Sixth Amendment of the United States Constitution (Sixth Amendment) to confront and cross-examine witnesses.

### A. Additional Background

At the motion in limine stage, the trial court excluded all evidence regarding the immigration status of defendant and of complaining witnesses and their families.

---

[5] The prosecution and defense presented competing experts regarding Child Sexual Abuse Accommodation Syndrome. As this expert testimony is not relevant to our analysis, we do not summarize it.

During trial, the prosecutor disclosed to the defense that her office had just learned from the victim advocate for Doe 1's parents that each parent had filed an application for a U visa with the police department in January 2020. The prosecutor represented to the defense that the police department certified the parents' applications in July 2020. The police department had, however, retained only one document relating to the U visa applications: a letter from Mother's immigration attorney requesting the certification on the basis that Doe 1 was the victim of qualifying crimes in this case and Mother had been helpful and cooperative with investigating officers.

Defendant argued that he had the right to cross-examine Doe 1's parents regarding their U visa applications, and he requested that the court order a brief continuance and direct the prosecution to turn over the U visa applications. The prosecution agreed that U visa evidence provided potential impeachment evidence, and she did not oppose a short continuance to obtain the missing documents. She requested that the court hold an Evidence Code section 402 hearing (402 hearing) after her office investigated the parents' U visa applications, maintaining that the timing of when the parents learned about the U visa would play a "crucial" role in determining the evidence's probative value.

The court called the parents' victim advocate to testify, and she stated that her clients had mentioned to her "a while back" that they were interested in applying for a U visa. This may have occurred in 2021, but she was unsure about the timing. She

9

advised them to wait until after trial, but she believed that they applied because an immigration consultant contacted her thereafter to discuss the subject.

After hearing from the victim advocate, the trial court ordered the prosecution to attempt to obtain the U visa applications and dismissed the jury with plans to resume trial the next day with witnesses who would not be affected by the U visa issue. The prosecution obtained a copy of Doe 1's parents' U visa applications later that day and provided them to the defense.[6] The prosecution then moved in limine to exclude the U visa evidence as irrelevant, citing *People v. Villa* (2020) 55 Cal.App.5th 1042 (*Villa*) (a case discussed further *post*) and arguing that Doe 1's parents were not victims and there was no evidence that they knew about a U visa before they reported the abuse. Alternatively, the prosecution requested a 402 hearing.

At the argument on the prosecution's motion in limine, defendant sought to exercise his Sixth Amendment right to impeach Doe 1's parents with information regarding their efforts to secure U visas, contending that it was a question for the jury whether Doe 1's parents influenced her testimony. Defendant highlighted that Doe 1 had testified that it was okay to lie when her mother told her to, and she did not remember if anyone told her to lie in court. The prosecution requested a 402 hearing, arguing that the question really came down to when the parents

---

[6] The parents' U visa applications are not part of our appellate record, but the parties agree that the parents submitted these applications and the police department certified them in 2020.

knew about the U visa. Defendant agreed that the evidence would be more probative if the family was aware of the U visa before Doe 1 made her disclosure, but it was nonetheless relevant because the U visa requires the applicant to be helpful to the prosecution and could provide a motive for embellishment.

Both parents gave testimony at the ensuing 402 hearing. Father testified that he heard of the U visa on the news before Doe 1 reported being abused. He testified that he did not remember what he knew about the U visa when he heard it on the news. He further stated that he did not know what a U visa would do for him, whether it would help him, or what was needed to qualify as of the date he testified, and he did not remember applying. He also did not know the status of his U visa application.

On cross-examination, Father clarified that he heard "the information about the U visa" while watching a commercial with Mother, although he did not pay much attention to the commercial. He did not remember when he applied for a U visa, but he confirmed that he had applied. He applied at a lawyer's office, but he "wasn't told anything," he "just went to obtain information" because he had "just [been] thinking about it," and he did not know when he found out that he qualified for the U visa. On redirect, Father said that he went to the attorney's office specifically to talk about the U visa, but that was after Doe 1 disclosed what had happened to her.

Mother testified that she learned of a U visa when she was watching television with Father, but she did not remember the

11

date. She went with Father and applied for a U visa with a lawyer's assistance after speaking to her victim advocate, but she did not remember when or whether she and Father had talked about applying. Mother testified that she did not have knowledge or understanding of what a U visa was at the time Doe 1 reported being molested.

On cross-examination, Mother confirmed that she presently knew that a U visa was available for victims of crimes to get legal status, and, when defense counsel asked her to confirm that was why she had asked her victim advocate to help her get a U Visa, Mother replied, "Correct." Her victim advocate advised her not to apply for a U visa until after trial, but she applied in January 2020. On redirect, the prosecution asked Mother whether she remembered what the commercial she saw on television said or meant, and she said she did not remember; she also said that she did not know what a U visa was when she asked her victim advocate about it. On re-cross, Mother testified that she did not remember how she knew to ask her victim advocate about the U visa. The following exchange then occurred: "[Defense counsel] Q. Okay. But you knew what a U visa was, correct? [¶] [Mother] A. Well, because I saw it in the news. [¶] [Defense counsel] Q. Okay. So when you saw the U visa on the news, you knew it applied to you when you filed this case, correct? [¶] [Mother] A. Correct." Mother did not know the status of her U visa application.

After hearing additional argument, the court ruled for the prosecution on the issue, indicating it would exclude all evidence

12

regarding the U visa applications, with the following explanation: "I believe that this evidence is relevant. And I even said that before. Now that I know that [Doe 1's] parents knew about the U visa before makes it even more relevant than what I thought before they testified. And I do believe motive obviously is an issue; credibility is an issue. But I still believe in terms of the U visa that the probative value of it is outweighed by undue consuming of time, confusion of issues and that it would be unduly prejudic[ial] to the victim. [¶] Our 402 hearing took quite some time just to get out very few details. We didn't learn too many concrete facts about anything because there was some indication that they didn't remember. They couldn't tell us when exactly they learned about the U visa, but I think it was through [Father] well, it was before the report. [Mother] could not remember. So, I think it would take a lot of time to get very little out of it."[7]

During Father's trial testimony, outside the presence of the jury, defendant again asked for permission to cross-examine the witnesses on their U visa applications. Defendant addressed the court's undue consumption of time concern, arguing that Mother had been answering cross-examination questions directly before the jury, and the court could take judicial notice of relevant federal law and/or provide a special jury instruction. The court

---

[7] The court also addressed defendant's desire to cross-examine Doe 1's parents about their efforts to secure low-income housing at the 402 hearing, and the court allowed cross-examination on that topic.

maintained its prior ruling, stating that it had been difficult to get information from the witnesses regarding the U visa applications, it was not clear they even knew the U visa process, the prosecution had the right to call an expert on the topic even if defendant shortened his presentation, and, in addition to undue consumption of time, the court had factored in the potential for prejudice against the victim and her family.

Defendant later moved for a mistrial based in part on the court's stated exclusion of the U visa evidence because of potential prejudice. He argued that the prosecution's delayed notification of the U visa applications violated *Brady v. Maryland* (1963) 373 U.S. 83, and, had the evidence been timely discovered, the parties could have conducted voir dire of potential jurors to eliminate any potential prejudice.

The court denied the motion. It explained, "I conducted the 402 hearing, listened to both [Father] and [Mother]. It was unclear if they knew exactly what a U visa was, exactly when they knew. There was just one indication that they saw something on the news before this report of molest — alleged molest. Beyond that, not much information was gathered through their testimony or given through their testimony about what exactly a U visa was, what they could — it could be used for, and it's my understanding that they don't even know the status of their application. [¶] There are — in addition to that, as I indicated, our 402 hearing took quite some time. And so the undue consumption of time certainly weighed heavily in my decision, among the other things that I've already discussed."

### B. Governing Law

The right to conduct cross-examination in criminal cases is a fundamental, constitutionally protected right. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1279.) The Sixth Amendment (applicable here through the Fourteenth Amendment's due process clause) guarantees a defendant the right to confront the witnesses against him. (*Davis v. Alaska* (1974) 415 U.S. 308, 315.)

"Cross-examination for bias, in particular, has a special place in confrontation clause jurisprudence." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1279.) Exposing a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679 (*Van Arsdall*).) "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." (*United States v. Abel* (1984) 469 U.S. 45, 52.) The high court has recognized, however, that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Van Arsdall*, *supra*, 475 U.S. at p. 679.)

To assess whether a confrontation clause violation has occurred, the reviewing court first considers "whether the trial

15

court exercised sound discretion under state law evidentiary standards in limiting the scope of cross-examination." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1282.) Next, if "a trial court effectively renders cross-examination an exercise in futility, we must . . . ask a further, purely constitutional question whether '[a] reasonable jury might have received a significantly different impression' of the challenged witness's credibility if the proposed line of cross-examination had been permitted." (*Ibid*.) We review this latter point de novo. (*Id*. at p. 1283.) And if a constitutional violation has occurred, the court asks whether, assuming the damaging potential of the cross-examination were fully realized, the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Van Arsdall*, *supra*, 475 U.S. at p. 684.)

### *C.* Villa *and* Castaneda-Prado

In *Villa*, *supra*, 55 Cal.App.5th 1042, the first published California case to address the admissibility of U visa evidence for impeachment, the victim of domestic violence applied for a U visa after giving her statement to the police and testimony at the preliminary hearing. (*Id*. at pp. 1047–1048.) The court recognized that the U visa application was relevant to the issue of credibility, and, from this evidence, a jury could infer that the witness had a personal interest in testifying. (*Id*. at pp. 1051–1052.)

*Villa* nonetheless concluded that the trial court acted within its discretion in excluding the U visa evidence under Evidence Code section 352. (*Villa*, *supra*, 55 Cal.App.5th at

16

p. 1054.) The U visa evidence had limited probative value given that "overwhelming" physical evidence of the defendant's abuse strongly corroborated the victim's testimony, the victim testified that she became aware of the U visa program after she gave her preliminary hearing testimony, and her trial testimony was largely consistent with her preliminary hearing testimony. (*Id.* at pp. 1045, 1052–1053.) On the other hand, there was a probability of undue consumption of time and confusion of issues because additional testimony would be required regarding the victim's knowledge of the U visa process and her discussions with the district attorney, and expert testimony would have been required to educate the jurors on the U visa process. (*Id.* at p. 1053.) And, although the jury in *Villa* knew the victim was not in the country legally, there was "a potential for prejudic[e]" if jurors found out that the victim could use the crime to gain a path to legal immigration status. (*Id.* at pp. 1053–1054.)

*Castaneda-Prado, supra,* 94 Cal.App.5th 1260, which was decided after defendant's trial, presents the "polar opposite" scenario. (*Id.* at p. 1286.) There, the defendant committed lewd acts on two children, and the trial court precluded cross-examination regarding testimony from one victim (Jane Doe 2) from the preliminary hearing wherein she acknowledged that she believed her accusation would help her mother obtain a U Visa. (*Id.* at p. 1267.) *Castaneda-Prado* found that evidence had significant probative value, as distinguished from *Villa*, because there was no corroborating physical evidence and the case "turned almost entirely on credibility," meaning the U visa

17

evidence was "of weighty probative value on a critical issue" (*id.* at p. 1287); Jane Doe 2 "admitted she knew of and was motivated by potential U visa benefits when she first gave a sworn statement accusing [the defendant] of abuse" (*id.* at p. 1288); and Jane Doe 2's testimony "grew more detailed and more incriminating to [the defendant] over time" (*ibid.*).

*Castaneda-Prado* further determined the record did not support the trial court's concerns that the U visa evidence would be unduly time consuming because Jane Doe 2's testimony that she was motivated by the desire to help her mother obtain a U visa obviated the need for expert testimony to explain the U visa process or testimony regarding Jane Doe 2's understanding of the role her accusation could play. (*Castaneda-Prado, supra,* 94 Cal.App.5th at pp. 1288–1289.) Nor did the record support the trial court's prejudice concerns: Since Jane Doe 2 was a United States citizen and Doe 2's mother was not a witness, any concerns over the jury's views regarding immigration status were "attenuated at best." (*Id.* at pp. 1289–1290.) The trial court thus abused its discretion by excluding the evidence under Evidence Code section 352 because "the probative value of the proffered evidence of bias here was weighty, and there was virtually nothing of any significance on the other side." (*Castaneda-Prado,* at p. 1290.)

Because the evidence at issue was not "of 'marginal' relevance [citation] or otherwise inadmissible under a routine exercise of the trial court's authority to regulate the limits of cross-examination," *Castaneda-Prado* went on to consider

18

whether the defendant's confrontation rights were violated. The court concluded that a reasonable jury might have received a significantly different impression of Jane Doe 2's credibility had the proposed cross-examination been permitted. (*Castaneda-Prado, supra,* 94 Cal.App.5th at p. 1291.) The court explained that Jane Doe 2's testimony was "the most crucial" because the defense had attacked Jane Doe 1's credibility, while it could only point out with respect to Jane Doe 2 that there were some discrepancies between the children's accounts of the abuse. (*Id.* at p. 1292.) The U visa evidence would have given the defense "a powerful basis to question [the victim's] veracity" and a reasonable jury, presented with that attack, could have viewed Jane Doe 2's testimony as the fabrications of a teenager who sought to help her mother and support a friend. (*Ibid.*) The confrontation clause violation was not harmless beyond a reasonable doubt because, among other reasons, nothing decisively corroborated or contradicted Jane Doe 2's account; the prosecution's case did not compel a conclusion that the defendant was guilty; and the prosecutor's closing argument disingenuously "highlighted the absence of any proven basis to question the motives of either [victim]." (*Id.* at p. 1293)

### D. Analysis

Defendant argues that this case is "extremely similar" to *Castaneda-Prado.* The People disagree, highlighting similarities between this case and *Villa* and contending that the trial court's ruling was not in error. For the reasons explained *post*, we conclude that, while this case is distinguishable from *Castaneda-*

19

*Prado* in certain respects, the trial court erred in prohibiting all cross-examination about the parents' U visa applications.

## 1. Evidence Code Section 352

Relevant evidence is generally admissible (Evid. Code, § 351), subject to a trial court's authority to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "The Evidence Code speaks in terms of avoiding '*undue*' consumption of time on collateral matters [citation] and '*undue*' prejudice or jury distraction . . . . Thus, Evidence Code section 352 balancing is undertaken on a sliding scale. 'The more substantial the probative value of the evidence, the greater the danger of the presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence. [Citation.] [¶] Where the evidence relates to a critical issue, directly supports an inference relevant to that issue, and other evidence does not as directly support the same inference, the testimony must be received over [an Evidence Code] section 352 objection absent highly unusual circumstances.' " (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1285.) To outweigh evidence with substantial probative value, significant countervailing factors must be present. (*Id.* at pp. 1290, 1285.)

Here, defendant's theories regarding the relevancy of the U visa applications were that Mother and Father, with Doe 1's cooperation, fabricated the initial accusations of abuse to obtain

20

U visas, and the obligation to be "helpful" to the prosecution attendant to the U visa application caused the witnesses to fabricate or embellish trial testimony.[8]  The trial court agreed that the U visa evidence was relevant, but the court found that the probative value of the evidence was substantially outweighed by the risk of undue consumption of time and the risk of potential confusion of the issues and prejudice.  As explained *post*, we conclude the trial court erred in excluding the U visa evidence.

An important similarity between *Castaneda-Prado* and the present case is that the U visa evidence at issue "was proffered on a highly consequential issue" for the defendant.[9]  (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1286.)  In contrast to *Villa*, where there was extensive corroborating evidence of the victim's

---

[8] The U visa program allows an "alien" who is a "victim" of certain crimes to petition for "U nonimmigrant" status if he or she satisfies certain eligibility requirements.  (8 U.S.C. § 1101(a)(15)(U)(i)(I)–(IV); see also 8 C.F.R. § 214.14(a)(14)(i) [implementing regulation defining "victim"].)  One eligibility requirement is that "the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful" to the prosecuting authority.  (8 U.S.C. § 1101(a)(15)(U)(i)(III); 8 C.F.R. § 214.14(b)(3) [adding requirement that "since the initiation of the cooperation, [the alien] has not refused or failed to provide information or assistance reasonably requested"].)  After a U visa has been approved, it may be revoked with notice if, among other reasons, "[t]he certifying official withdraws the U nonimmigrant status certification . . . or disavows the contents in writing."  (8 C.F.R. § 214.14(h)(2)(i)(A).)

[9] Neither party disputes that defendant laid a proper foundation to cross-examine Father and Mother about their U visa applications in this appeal.

21

abuse (*Villa*, *supra*, 55 Cal.App.5th at pp. 1045–1047), here there was no physical evidence of defendant's crime against Doe 1. The prosecution's case depended to a large extent on the credibility of Doe 1 and her family, and the prosecutor reinforced the centrality of credibility to jurors, arguing that Doe 1's family was truthful, Doe 1 had no reason to fabricate the abuse, and the jury should convict defendant if they believed Doe 1. Because credibility was central, the U visa evidence proffered to impeach Mother and Father to show self-interest was "evidence of weighty probative value on a critical issue." (*Castaneda-Prado*, at p. 1287.)

The People contend that the U visa evidence was of marginal probative value because there was no evidence showing that Doe 1's family reported defendant to obtain U visas. We disagree with the People's characterization of the record.

There was evidence from which a reasonable juror could conclude that Father believed the U visa could provide some form of legal immigration status for crime victims before reporting Doe 1's abuse. Father testified that he heard about the U visa from a commercial about U visas that aired during the news before reporting Doe 1's abuse. He said he did not pay much attention to the commercial, but he agreed that he went to a lawyer's office sometime after reporting Doe 1's abuse and applied for a U visa. When asked how he knew to apply for a U visa, Father replied that he "went to obtain information." When asked what made him do that, Father said, "Nothing. Nothing happened. I was just thinking about it." Father confirmed that he went to the attorney to talk about the U visa specifically, not his immigration

22

status generally. And the record reflects that Father and Mother went to an immigration attorney to discuss their U visas. From this evidence, a reasonable juror could conclude that the commercial Father saw before reporting Doe 1's abuse was his source of knowledge regarding the U visa, he learned from the commercial that the U visa provided some form of legal immigration status for crime victims, and, for that reason, he went to an immigration attorney to discuss the U visa after reporting Doe 1's abuse.

The record supports the same inference with respect to Mother. Mother and Father watched the same commercial about the U visa, so a reasonable juror could infer that Mother too learned that the U visa provided an immigration benefit before reporting Doe 1's abuse. In addition, when Mother testified that she did not know, or could not remember, how she knew to ask her victim advocate about a U visa, defense counsel asked, "Okay. But you knew what a U visa was, correct?" Mother responded, "Well, because I saw it in the news." Mother also confirmed that she asked her victim advocate to help her get a U visa before she spoke to a lawyer because Mother knew that a U visa was available for victims of crimes to get legal status.

In sum, this record provides substantial probative evidence from which a reasonable juror could conclude that Father and Mother learned that U visas could provide crime victims with the benefit of legal immigration status from the same commercial before Doe 1 reported the abuse. The People contend that the U visa evidence was of marginal probative value, pointing to

23

Mother's testimony that she did not understand what the U visa was before reporting the abuse, and to Father's testimony that he did not know what was needed to qualify and did not remember what he knew about the U visa when he saw the commercial. But this testimony created a jury question. It did not gut the probative value of the conflicting inference that could be drawn from the evidence discussed above, and it was ultimately for the jury to judge the credibility of the witnesses and to resolve discrepancies in Mother's and Father's testimony.

Furthermore, the probative value of the U visa evidence in this case did not turn exclusively on Mother's and Father's knowledge of the U visa's immigration benefit prior to the initial report of Doe 1's abuse. Here, Doe 1's trial testimony was more incriminating than her initial police statement because she testified that defendant touched her on two different occasions both under and over her clothing rather than the one occasion over her clothing that she initially reported. On cross-examination, Doe 1 also agreed that what she had told police "was the truth at the time." At the same time, Doe 1 confirmed that she was close with her mother, she wanted her mother to be happy, her mother had helped her remember some of the things she was supposed to say at trial, and Doe 1 believed it was okay to lie sometimes when her mother told her to. A reasonable juror could conclude from this evidence that Mother's and Father's U visa applications, which were submitted after the initial report of abuse but before trial, motivated them to encourage Doe 1 to embellish her trial testimony.

24

In addition, the defense presented the jury with the theory that the family initially fabricated the allegations of abuse to get low-income housing. The prosecution countered that this theory was unreasonable because it made "zero sense" that Doe 1's family did not get low-income housing, "yet they are still here lying to try to get it." A reasonable juror could have agreed with the prosecution, and, in that scenario, the U visa evidence could have supplied a motive explaining Doe 1's family's trial testimony that was otherwise absent.

On the other side of the Evidence Code section 352 balancing scale, the trial court expressed concern for undue consumption of time, confusion of the issues, and prejudice, but the record does not support a conclusion that these factors *substantially outweighed* the probative value of the U visa evidence.

With respect to undue consumption of time and confusion of the issues, even if the trial court correctly determined that there would have been a need to present evidence about the U visa program and when and whether the parents learned about it, the court was free to place reasonable limits on the scope of evidence to be presented, and defense counsel suggested some ways to streamline the presentation of the issue below. Most importantly, unlike in *Villa*, the starting point for the balancing analysis here is that the proffered U visa evidence had substantial probative value. Given the significance of the U visa evidence to show bias, the "Evidence Code section 352 balancing must begin . . . with a sharp tilt on the sliding scale in favor of

admissibility." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1285.)  The concerns about time consumption and jury distraction that outweighed the limited probative value of the U visa evidence in *Villa* did not justify total preclusion of U visa evidence here.

With respect to the potential for prejudice, although the record does not reveal Doe 1's immigration status, the parties agree that Mother and Father were undocumented immigrants. They were testifying witnesses, so the trial court was justifiably concerned about the potential for prejudice that might flow from the introduction of evidence of their immigration status.  (See *Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1289.)  Given the weighty probative value of the evidence, however, the risk of prejudice did not substantially outweigh defendant's right to effectively probe into a matter directly bearing on the critical issues of witness credibility and bias.

In the circumstances of this case, given the significant probative value of the U visa evidence, the trial court exceeded its discretion in excluding it under Evidence Code section 352.

## 2. Confrontation Clause

Like *Castaneda-Prado*, the evidentiary ruling here cannot be characterized as a routine exercise of trial court discretion. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at pp. 1290–1291.)  The court prevented defendant from engaging in any questioning on the U visa topic.  We therefore proceed to consider defendant's confrontation clause violation claim.

Reviewing the issue de novo, we conclude that, had defense counsel been permitted to pursue the U visa issue, "[a] reasonable jury might have received a significantly different impression" of the witnesses' credibility. (*Van Arsdall*, *supra*, 475 U.S. at p. 680; see *Castaneda-Prado*, *supra*, 94 Cal.App.5th at pp. 1291–1292.) Given the evidence in this case and the important benefit of legal immigration status associated with the U visa, a reasonable jury presented with defendant's proposed line of attack regarding the U visa might have viewed Doe 1, Mother, and Father with skepticism, both as to the parents' testimony and as to whether Doe 1's testimony about the abuse was fabricated or embellished with their encouragement.[10]

The People have correctly pointed out that defendant cross-examined the parents about their low-income housing application, and we note that the defense also highlighted some inconsistencies between their testimony below and in Lucio V.'s trial, as well as in Father's statements to police. This distinguishes *Castaneda-Prado*, where the exclusion of the U visa evidence left the defendant with "no other meaningful way to impeach [Jane] Doe 2." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1291.) But we do not believe that the permitted cross-examination changes the answer to the "significantly different impression" inquiry (*Van Arsdall*, *supra*, 475 U.S. at p. 680). The

_____

[10] We do not endorse any particular reading of the evidence, and we do not weigh in on whether the witnesses testified truthfully. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1292, fn. 17.) We hold only that the defense should have been permitted to present its theory to the jury. (See *ibid.*)

27

U visa evidence arguably could have presented a distinct direct motive for the parents to encourage Doe 1 to fabricate or embellish the abuse. And, as the prosecution pointed out in closing argument, the strength of the low-income housing evidence was diminished because the family did not get low-income housing, Mother testified that she learned a police report may help only after reporting the abuse, and there was no evidence that Mother or Father even gave a police report to the low-income housing staff.

Given the record in this case and the importance of obtaining legal immigration status, a reasonable jury might have received a significantly different impression of Doe 1's family's credibility had questioning about the U visa applications been allowed. "By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." (*Van Arsdall*, *supra*, 475 U.S. at p. 679.)

### 3. Harmless Error

The error was not harmless beyond a reasonable doubt. The factors relevant to this harmless-error analysis include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination

28

otherwise permitted, and . . . the overall strength of the prosecution's case." (*Van Arsdall*, *supra*, 475 U.S. at p. 684.)

Here, as set forth *ante*, the prosecution's case with respect to count 1 turned largely on the credibility of Doe 1 and her family. Although the jury heard and believed the evidence that defendant sexually abused Does 2 and 3 some three to nine years before he allegedly abused Doe 1, there was no corroborating physical evidence of defendant's crimes against Doe 1. Certain cross-examination of Mother and Father was permitted, but, as we previously discussed, that inquiry was not likely to have the same impact as the cross-examination about the U visa issue. Considering these circumstances, "we cannot say the overall strength of the prosecution's evidence compelled but one conclusion — [defendant] was guilty as charged beyond a reasonable doubt." (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1293.) We therefore reverse the conviction on count 1.

## II.    One Strike Sentences on Counts 3, 5, and 6

The parties agree, and we concur, that defendant's sentences on counts 3, 5, and 6 are unlawful because the information did not provide fair notice of the specific One Strike sentence defendant faced.

The amended information alleged that defendant had committed counts 3, 5, and 6 pursuant to section 667.61, subdivisions (b) and (e)(4), which implicates a term of 15 years to life in prison. The information did not allege special allegations pursuant to section 667.61, subdivision (m). The prosecutor nonetheless requested the imposition of separate concurrent

terms of 25 years to life on counts 3, 5, and 6 pursuant to section 667.61, subdivision (m). Defendant objected based on lack of adequate notice, and the prosecutor responded that the information alleged the victims were over 14 in the substantive counts, giving defendant sufficient notice that section 667.61, subdivision (m) applied. The court agreed with the prosecution and sentenced defendant to 25 years to life on the counts at issue.

*In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*), recently clarified that the type of notice given in this case did not adequately convey the prosecution's intent to seek the specific sentence imposed under the One Strike law. In *Vaquera*, a jury convicted the defendant of two counts of lewd acts on a child under age 14 in violation of section 288, subdivision (a). (*Vaquera*, at pp. 714–715.) As to one of the counts, defendant was sentenced to an indeterminate term of 25 years to life under section 667.61, subdivision (j)(2). (*Vaquera*, at pp. 715–716, 720–721.) The 25-year-to-life sentence violated due process because the One Strike allegation cited only to the multiple victim circumstance in section 667.61, subdivisions (e)(4) and (b). (*Vaquera*, at pp. 721, 723–725.) The allegation failed to provide fair notice of the prosecution's intent to invoke the circumstance on which the trial court relied to sentence the defendant because it "did not specify that the prosecution was seeking 25 years to life on that count, cite to [section 667.61,] subdivision (j)(2), or otherwise make clear that the prosecution was seeking a longer sentence based on the victim's age." (*Vaquera*, at p. 725.)

30

Having determined the 25-year-to-life sentence violated the defendant's due process right to fair notice, the *Vaquera* court further concluded the error was not harmless. (*Vaquera, supra*, 15 Cal.5th at p. 726.) The purpose of statutory pleading requirements is to give a defendant the opportunity to make informed decisions about defense strategy. (*Ibid.*) "Because the information could be reasonably read as indicating that the prosecution had elected *not* to seek 25 years to life under [section 667.61,] subdivision (j)(2)," the Attorney General had not met its burden "to demonstrate that Vaquera was aware of the sentence the prosecution was seeking at a time when he could have taken his sentencing exposure into consideration in making key decisions about how to conduct his defense, 'including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial.'" (*Vaquera*, at p. 727.)

This case is analogous to *Vaquera*. The One Strike allegations pertaining to counts 3, 5, and 6 in the information cited section 667.61 subdivisions (e)(4) and (b), and not subdivision (m). "[T]he information is most reasonably interpreted as conveying a prosecutorial election not to rely on the age of the victim — and thus not to invoke subdivision [(m)] in connection with [counts 3, 5, and 6]." (*Vaquera, supra*, 15 Cal.5th at p. 724.) We will accordingly order the reduction of defendant's sentences on counts 3, 5, and 6. (*Villegas, supra*, 97 Cal.App.5th at pp. 269–280 [finding similar sentencing error and reducing One Strike sentences].)

## III. Noneconomic Restitution

In his opening brief on appeal, defendant raised a conditional challenge to the trial court's award of restitution under section 1202.4 for noneconomic losses to the mothers of the Does. Defendant raised the issue for our determination only if our Supreme Court granted review of a similar award of noneconomic restitution in *Villegas, supra*, 97 Cal.App.5th at pages 282–283. We need not address the propriety of the noneconomic restitution award because, after defendant filed his opening brief in this appeal, the Supreme Court denied the defendant's petition for review in *Villegas*. (*People v. Villegas*, review den. Jan. 31, 2024, S283126.)

## DISPOSITION

We reverse defendant's conviction on count 1 and remand for further proceedings on that count. Defendant's sentences with respect to counts 3, 5, and 6 are each reduced from 25 years to life to 15 years to life. The judgment is otherwise affirmed.

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*People v. Villegas* (A165626)